Case number 093617, Donald Howell v. Chicago Housing Authority. And identify yourselves for the record. Okay, so as you know, or I'm sure you know, we do not necessarily hold you to the specific time limits. We basically, depending on the number of questions that are asked, so you've got some freedom. So, forge ahead. You've got two. I'll make one comment on this case before. This would have been a good case to have gone to the settlement committee. But since you have elected not to do that, it may be too late. But at the end, you've still got that option. Forge ahead. Good morning, your honors. Again, Karen DeGrand on behalf of the defendant, Pollant, the Chicago Housing Authority. May it please the court. As the court is aware, the CHA requests the court to enter a JNOV or order a new trial, based on gaps in the plaintiff's causation case. The plaintiff's proximate cause presentation, it is our position, did not rise above speculation. And I'm sure that the question that the court has for me, and so this is what I will begin with, is why isn't the expert testimony sufficient? And my answer to that question is, it has to be based on physical facts and a reasonable certainty. The plaintiff had the burden of proof on proximate cause to go from point A, which is that during Ms. Turk's pregnancy in 1991, she resided in a CHA building that had lead paint. And that after the birth of her son, she returned to the apartment. And according to the plaintiff's experts, the period of exposure... It wasn't that she returned, she continued to live there continuously. Correct. After her hospital stay, she actually had to marry and go home? No. I don't understand what you're... I'm just saying that her residence in the apartment continued at that time, your honor. I'm not attaching anything other than the fact that she was residing there. And to set out the factors that were important to the plaintiff's experts, that the exposure continued at that time, and that the child continued at that time to be exposed. The difference being that the child was no longer in utero and was not as susceptible to the damage, according to their experts, as he was as a fetus. According to the plaintiff's experts, the child was more susceptible as a fetus, but also that the injury continued after the child was born and was residing in the apartment with the mother. And that, according to Dr. Given, the injury continued during the first few years of life. But presumably, as each flake of paint fell from the wall and fell from the ceiling and was swept up and inhaled by the mother during the period of time, which seems to be without any controversy whatsoever, there would by definition be less paint falling because there's less paint left on the walls and the ceiling. So it's not a constant of what the exposure to the poison would be. Is that correct? The testimony by Ms. Turk's, Your Honor, was that the paint, the lead chips, continued to fall. We know that not just from Ms. Turk's testimony, but of course also from the stipulation that was entered into by the parties and the admission of the CHA, that there was peeling, flaking paint during the entire time up through the July 1994 diagnosis. And yes, according to Ms. Turk's, the peeling diminished to some extent over time, but she definitely says that it continued over this period of time. And it was Dr. Given's testimony that the injury continued over the first few years of life. Can we cut to the chase and start going into what's circumstantial and what you don't find acceptable in their circumstantial evidence? Because basically I look at this and say, well, they proved their case. And you did not prove your case. The jury accepted it. Are we going to overwhelm and reverse a jury that 12 people found quite simple on this? And you've got the argument, which you have to prove, is it's not more probable or possible. And I don't see that you've established that this is not possible or probable. Your Honor, the first point I'd like to make is that the plaintiff had to go beyond showing that the lead as a cause was possible. The plaintiff had to prove proximate cause to a reasonable certainty. And the expert's testimony could not be accepted merely because the experts declared that they were giving their testimony to a reasonable degree of medical certainty, but it was the court's job to look at the foundation for the expert testimony and determine whether it had a sufficient foundation and whether the court as gatekeeper should allow that testimony to go to the jury. So with the medical test being one of the chief factors that the experts rely on, that did not get them to the lead level. Why not? Because they said it wasn't the lead level that they needed it to be, Your Honor. Dr. Given and Dr. Gabriel... But the lead level was tested, what, two and a half years after the child was born? That's correct. Which was like three years after, more than three years after the fetus became affected by the lead. And it was so high. I oppose that to the testimony of your retained expert, who suggests a genetic cause but can come up with no known genetic disorder that would be consistent with the symptoms that were demonstrated by this individual. If that's the best you can do, and I respect all the lawyers in this case, and believe me, from my experience, I respect people as a former public defender who have to get up there and argue things where the facts aren't necessarily in your favor. But if that's the best that your experts can come up with, then it's really very little mystery why the jury found as it did. Your Honor, what I take issue with in your question right there is the assumption that the child's condition was caused by lead. I mean, that was the plaintiff's burden to prove. And the plaintiff started with the acknowledgment of both of her experts. According to Dr. Given, chromosomal abnormality is the most commonly identified characteristic with severe mental retardation as we have in this case. But your doctors couldn't realistically come to a conclusion to a degree of whatever that that was the cause in fact. I would have to disagree with that, Your Honor. I don't think that's the testimony. This case was pending for how many years before trial? I believe it was refiled in 2004, Your Honor. So it was pending for some five or six years before trial? Correct. And was there ever a request that I haven't seen in the record to have genetic testing done by the defense? The defense didn't request genetic testing, Your Honor. Of course, the defense didn't have the burden of proof on proximate cause. Also, the defense relied on Dr. Ricardo's quite certain testimony that the neurogenetic markers, in conjunction with the severe injury that the child displayed, pointed away from a lead poisoning situation or attributing his So confident in that being persuasive in the face of the plaintiff experts saying that it was based upon the lead, that you decided it wasn't useful to ask for a genetic test? Your Honor, the doctor, as I said, we relied on Dr. Ricardo's testimony, which also explained that genetic testing is not necessarily conclusive. There are many genetic abnormalities that cannot be identified. If you had a genetic test that was positive, wouldn't you be up here arguing that that was the cause of the injury? I would be arguing that. Yes, Your Honor. It seems to me that you're arguing that you can't prove an in utero lead poisoning case unless lead testing was done immediately after the birth. Is that what you're saying? What I'm saying is we don't have adequate testimony to tell us what the lead level was so that the child's condition can be attributed to the blood lead level as opposed to the at least equally if not greater likelihood that it was attributable to a genetic defect or chromosomal abnormality, Your Honor. And of course it's undisputed on this record that there's no information about the blood lead level of the mother ever. There's no information that there is And the reason, as the plaintiffs point out in their brief, was that unlike your client, they had no knowledge of the presence of the lead at a time where the lead level would have been a relevant test to have done. They had no knowledge, Your Honor, and that was part of our admission. But that didn't alter the fact that they carried the burden of proof on causation. They had a lead level test done on me because I don't know any reason to do it. Correct. And that's absolutely correct. And that was one of the points that we stated. Certainly Judge Elrod emphasized and reemphasized that point to the jury so that there would be no suggestion to the jury that anybody was being faulted, far from it. And defense counsel made that statement also in his opening statement, that nobody's blaming anybody for not having the test. But the fact of the matter is, and the legal burden is, to prove proximate cause to a reasonable certainty here. And we don't have that. We have evidence that through the plaintiff's experts that they believe that there was lead poisoning. And that's a term that Dr. Gabriel used. But it doesn't come out of thin air. It talks about that she lived in an apartment during her pregnancy with peeling and flaking lead paint, that she swept it up, causing her to ingest it by breathing, that the lead crosses the placental barrier in pregnant women, that lead is a neurotoxin, that it has increased effect on fetuses as opposed to adults, and so the levels are lower for causing damages there, that the child was born microcephalic, that that's a known reaction to this type of poisoning. The pale disks in the eyes, splaying and clubbing in the ribs, I mean, on and on and on. And so, yeah, it's circumstantial. But the question is whether it was so deficient as to bar a jury from considering this issue. And that's really what you're, you know, and there really isn't anything persuasive in any other known cause with due respect to the expert that the jury could say, well, this is the cause. Well, Your Honor, I would just point the Court to the one factor that the plaintiffs relied on. Yes, the Court is identifying a number of factors that say, yes, there was lead in the apartment, there was lead exposure, but we never had anything that could get us to a lead level that would cause this kind of damage. And that's the crux of our case. And the way that the plaintiff, the key fact that the plaintiff, that the plaintiff's experts emphasized was, they are finding that there was microcephaly at birth because they used that. What about Dr. Wasserman's 213? What does it say? Her 213, the 213 disclosure for Dr. Wasserman? Dr. Wasserman also talks about lead and talks about a calculation, but she doesn't say that lead is the cause of this child's problems. And the key, the point I guess I'm trying to make, Your Honors, about microcephaly is, it was a necessary part of plaintiff's case because they needed that medical finding to have some basis for calculating an amount of exposure. Because if you have a lead level, as Dr. Goodman acknowledged, as Dr. Gabriel acknowledged, of the 19, I'm just going to call it units because I'll stumble over the correct term, 19 to 25, it's not enough. They say it's not enough. But that was measured at two and a half years. But we don't know what it was going. But then they say that measurement is more sensitive for the unborn child. It takes less to damage an unborn child than it does for. They didn't, no, that's not exactly correct, Your Honor. What Dr. Gabriel said was that the lowest range he would put on it was 30 to 40. And so that's the level that he had to get to. He used the microcephaly finding to make this calculation. Here's the problem with that. Microcephaly, just like severe mental retardation, is commonly associated with chromosomal abnormality. So we have a very circular analysis here. We say, here's microcephaly, and I'll tell you how I know that it's caused by lead and not by a chromosomal deformity because here's microcephaly. It just, it doesn't work. But on the other side, where's the chromosomal abnormality? Where's the test of the chromosomes? Where's the known genetic cause of something like this that came out of the testing? There's not, there was not a known syndrome that was identified by Dr. Ricardo. However, Dr. Ricardo also stated that he determined that there was a 90% chance that this was associated with a genetic cause as opposed to lead or some other cause. But which is more probable? I mean, realistically, you can't substantiate your argument as to a cause, but they have, even though it's circumstantial. So is that not more probable and more possible than your cause? So therefore, you've defeated yourself. You can't, you're almost coming up with a double negative. I have to disagree. In contrast to your argument on extrapolation or going back and back and back. I mean, they've given a fact. They've given a fact that X was there. They've given a fact from even one of your own doctors that more possibly that it was this than it wasn't this. He couldn't say yes or no. And then your third argument is to the one that Dr. Elrod comes up, or Judge Elrod, you couldn't get certain things in. It leaves us with the facts that he has brought forth, and you have no facts. Well, I have to disagree with the court because I think that Dr. Acardo's testimony establishes the genetic component and certainly the acknowledgement and testimony of Dr. Gibbon and Dr. Gabriel that the genetic component is there. According to Dr. Gibbon, chromosomal abnormality is the most commonly associated factor with profound mental retardation. But you have no tests. That's correct. There's not a test, but according to Dr. Acardo's testimony, and there wasn't any testimony that refuted this, it's not unusual to not find a... There was no testimony I don't think that would be the most common cause when you have somebody living in an environment that is rife with lead and has a constellation of circumstances that would be consistent with lead poisoning. Well, Your Honor... I mean, nothing you've shown... I don't hear you arguing that it's inconsistent with lead poisoning. I'm sorry, say that again. I don't hear you arguing that the reaction of this child, now young adult, would be inconsistent with lead poisoning. The... All right, let me back up one minute. What you're saying, I think, is if there was proof that the lead levels were 40 or 50, there'd be no case for you, right? If there were proof that that would be, then we would have potentially a situation where I wouldn't be able to challenge the sufficiency of the evidence, but we don't have that proof. Right, because two and a half years after he was born was the first test, and all we know is that it was 25 at that point. And we don't know what it was previous to that. Right. We don't know. When he was in utero, he was presumably in an environment, unlike after birth, where you would be breathing air in a variety of different places, and his whole environment at that point was contained within his mother. Correct. Who was bringing in the lead through her inhalation. We don't know what the level was, though, Your Honor. And one of the telling, I think, very telling inconsistencies in the plaintiff's argument is that they make this finding of microcephaly when the child is born, and then the child, by all accounts, has achieved a normal head size by the time he's three weeks old when he's in the very environment that supposedly is so poisonous. That is an inconsistency, along with the lack of... How is that inconsistent with the concept that seems to be universally accepted by the experts, that there's a greater impact of a smaller amount of lead on a child as a fetus than after the child is born? Because the lead had to have been at a level to go through the mother to reach the child. Is this a healthful environment, or is it a toxic environment? The mother was living in the environment. The child is born. The child supposedly becomes much healthier after he's in the environment that supposedly is so toxic that the mother is poisoned and passes it on to the child. It doesn't make any sense. It's a fundamental inconsistency in their argument, Your Honor, that I think goes to the very heart of their case and prevents them from being able to prove their case. I'll address the new trial arguments as well, because I think we've vetted this portion of the case. And if the plaintiff's causation evidence met the minimum level, which we contend it did not, certainly there were issues that affected the CHA's ability to show the jury that the testimony of the plaintiff's experts was speculative and that there was a disconnect between the assumption and speculation that there was a high enough lead level to cause this problem. And I think one of the key facts in this is that the trial court allowed the plaintiff to emphasize the negligence stipulation to the point that the jury likely concluded that proximate cause was but a secondary factor. And didn't they address that? I mean, didn't the plaintiff state really accurately what their burden was in their argument? That statement was brought out along with many damaging statements that were inappropriate, Your Honor. And I don't think that it's a fair rendition of the closing argument to say, all right, we acknowledge that there's a statement in there that correctly says what the burden is, but we have a number of statements that repeat and repeat and repeat the stipulation. And, you know, with actual knowledge, actual knowledge, actual knowledge, three times in one sentence about the pain and the danger, the CHA didn't act. There's a suggestion and the only suggestion in the record that the CHA blamed the mother came from the plaintiff. There are multiple references to putting the child in danger, to the dishonesty of the defense. I mean, with all of those statements coming out, I don't think that you can expect the jury to be too concerned about the proximate cause element. These are prejudicial comments that deny the CHA of a fair trial. And they were appeals to moral outrage that have been recognized in multiple decisions, including a recent decision of this court in the Pleasance case, that are not appropriate, should not be tolerated, and that deprive a party of a fair trial. And there were other statements throughout the trial questioning of Dr. Blondis, of Dr. Cardo, of Dr. Given, that violated the order on the motion in limine to keep the emphasis. Okay, we've already got the stipulation that was read to the jury by the judge at the outset of the trial. It was re-read to the jury by the judge when the CHA objected to the questioning and to the elicitation of the same factual matters that were in the stipulation during Ms. Turk's testimony. She was allowed, even though the judge acknowledged that it was redundant, she was allowed two and three times to state those same facts on the argument of the plaintiff that these went to proximate cause. Do we need... But this isn't an admission of liability by the CHA. It was an admission as to certain evidentiary facts, which still, with the issue of proximate cause to be decided as one of the two critical issues, if it gets to the point of damages, being challenged by the CHA as to the existence of that proximate cause to show why the underpinnings for the expert's testimony as to what factors there were in the environment and in the evidence of the child's condition to demonstrate what that cause was. And it becomes, doesn't it, a fine line between something done just to hammer the wrongdoing, which would be totally inappropriate on one hand, and trying to demonstrate and prove probable cause, or excuse me, proximate cause, which is the requirement and really the main line of contention between the two parties. That's right, and the line was crossed in this case, Your Honor. And I think the record quite firmly documents it. Because the subject was brought up again and again, and the testimony with the first witness emphasized it again and again. And the judge also, and, you know, for the jury to hear the judge emphasizing and reemphasizing this concept of misconduct, of negligence, it was an admission of negligence, and of certain facial issues. If you're concerned that there would be some negative to this, isn't the judge saying that it's agreed, remove the taint from the defense, saying we're not contesting this. We're being fair about this in essence. We're saying that's not on the table. So let's talk about simply the matter of whether it can be proved to be the proximate cause. I mean, you're arguing, and I understand why, that there's a negative impact from reemphasizing this instruction. But from the trial judge's point of view, I'm not so sure it's something that is designed or would have the impact that you're complaining of that would create a negative toward the defense. Well, I don't see how it would have any other impact, Your Honor. When the judge is a person, and we're not talking about a witness making these statements. We're not talking about a lawyer making these statements. We're hearing it from the judge. We're hearing it from the person who is running the show. We're hearing it as a jury from the person who is telling what the law is, who is absolutely in charge. It's not a matter of an advocate. So, yes, I understand that it may be appropriate when there is an admission of negligence versus admission of liability for there to be certain discussion, certain testimony, and not the emphasis that we had in this case. You know, if there had to be a description one time, but do we need to have it after it was set out very clearly in the stipulation two and three and four times, and then the repeated questioning during the other witnesses, and then the closing argument that harped on the CHA's wrongdoing, dishonesty in its defense, this was very strong language I submit to the court. There are other errors that we raised in our brief that I think also in a quite damaging way hampered our ability to challenge the testimony of the experts for the plaintiff. If the emphasis on the CHA's conduct was not error, it certainly made other errors more damaging, more obviously harmful, is our position, and one example of that is the cross-examination of Dr. Gabriel that was barred. Because the key, the plaintiff acknowledges it in their brief. The condition of the apartment was an essential factor for their case. It was the bedrock of their case. That's where the problem was. That's what the culprit was. Okay. So we get to cross-examination, and Mr. Moore wants to ask Dr. Gabriel about the difference with Donald's blood level. He's treated for a short period of time. The blood level which had dropped from the first finger prick of 25 to 19 with no medication whatsoever, and then quickly drops to 10, never goes back up. And he's living in what the experts have doomed or called or condemned as this highly exposed environment. And that's a question that we should have been able to pose to Dr. Gabriel, and we weren't allowed to do it. And I think that that was, that impacted the CHA greatly. We also were precluded from addressing the microcephaly issue with Dr. Carter. We set that out in our brief as well. And these errors impacted the CHA's ability to counter the emphasis on negligence, and to fully explore the speculation that was being presented to the jury by the plaintiff's experts. So I'd like to reserve a few minutes for rebuttal if the court does not have any further questions.  Thank you. Your Honors, I'm not going to go through a lot of the proximate cause evidence, because the court obviously knows it and has recited it. The one point I would like to make, however, is that it was uncontradicted that the level of 25, which was measured when the child was 2 years, 8 months of age, was a level on its way down. It was undisputed in the case and admitted by Dr. Wasserman that the level had peaked before and was on its way down. So it is undisputed that that level was higher. Undisputed. The defense talks about the difference in Donald Howell after he was born and before he was born in terms of the lead in the apartment. And they say, look, there's a lead environment, so why is he improving? You have to look no further than the testimony of their own expert, Dr. Wasserman. Dr. Wasserman testified that in utero, a lead level of 10 units, each 10 units, reduces brain size and head size by a half a centimeter. After birth, in an adult, not just an adult, after birth, levels of 80, no symptoms. No symptoms at all. There is an enormous difference between the effect of lead in utero and the effect of lead after the child is born. And that comes from the mouth of the defendant's own expert. The defendant says that we emphasized the defendant's negligence and that the court emphasized the defendant's negligence. No such thing happened. It was vitally important in this case that the plaintiff establish that Mrs. Turks took in lead during her pregnancy. Without that, there would be a real proximate cause problem. Mrs. Turks was the conduit for taking in the lead and passing it to her child. The stipulation offered not a bit of evidence to support that, nothing. As the defense argued in opening statement, just because there's lead in the apartment does not mean that you're taking in lead. That is in their opening statement. And so I had to establish that there was not only lead in the apartment, but that this woman was inhaling lead. And how much lead? Was it just lead on one little piece of wood in the back of one closet? Or was it lead throughout the apartment on the walls and on the ceiling and falling and requiring that she clean it up every other day or every third day as she testified, creating dust and breathing it in? Without that, I would not have established proximate cause. When I tried to do that, the defense wants to blame the trial judge for repeating the stipulation. When I tried to put in that evidence to Mrs. Turks, the defense objected. So they objected I didn't prove proximate cause, and they tried to stop me from proving proximate cause. When that objection was made, the trial judge went back to the stipulation that the defense had entered into and read it to the jury so there would be absolutely no question in the jury's mind what the stipulation was and what it was not. That, to my recollection, is the only time that that stipulation was read again. The court referenced it one more time but did not read it one more time. And it was invited and required by the objection that the defense made that frankly should not have been made. The defense says that I accused them of dishonesty. I did no such thing. I've never, ever, ever accused the defense of dishonesty. What I said to the jury was that they admitted that they had failed to maintain the apartment and there was lead in the apartment. I still had to prove proximate cause. And if I didn't prove proximate cause, then it doesn't matter what they did, they don't give an award to Donald Howell. That's my closing argument. I did say, I did put in evidence that the defense did not tell Mrs. Howell about lead being in the apartment, but I had to because the defense emphasized over and over again that lead testing had not been done. I had to offer an explanation to the jury. Why wasn't lead testing done? Is it her fault? Did she do something wrong? Did she do something wrong in taking care of her child? No. Lead testing wasn't done because she just didn't know lead was in the apartment and couldn't tell her doctors. And that is what I put in evidence. My closing argument, by the way, there was no objection. Not a single objection to my closing argument. And this case was defended by two very, very experienced lawyers who defend a lot of lead cases. They were not asleep at the switch. My closing argument was proper. The defense argues that they should have been allowed to cross-examine Dr. Ricardo. That's not true. The defense argues that they should have been able to ask Dr. Ricardo, isn't it true that Donald Howell is not microcephalic? That would have been as gross a violation of 213 as this court will see. When I deposed Dr. Ricardo, keep in mind now, they claimed prejudice because Dr. Ricardo could not testify Donald Howell was not microcephalic. They declared an expert to say he was microcephalic. Dr. Wasserman's disclosure was Donald Howell is microcephalic. So their prejudice is they could not put on one expert to disagree with another of their experts. And there was no disclosure, by the way. No written disclosure in Dr. Ricardo's 213s about anything to do with microcephaly. Not a word. When I went out to take his deposition, I asked him about microcephaly because he said he had read Dr. Wasserman's report and microcephaly was in the report. And so I asked him, was Donald Howell microcephalic at birth? And he answered, as you saw here, I recall his head size being smaller than two standard deviations below the mean. I do not recall it being more than two and a half standard deviations below the mean at birth, which is the definition of microcephaly. And so I asked him, Doctor, is this the chart you would use? And it's attached to my brief. It's at the end of the brief. Is this the chart you would use to determine if Donald's head size is more than two and a half standard deviations below the mean? And he says, yes, it is. They argue that that was a chart that had a mean versus what you... They do. And I'll give you the history of that. In post-trial motion, they filed a post-trial motion, and in their post-trial motion they ignored the chart altogether. They filed their motion, said that the doctor referred to a chart, but didn't attach the chart. I attached the chart. They then responded that Dr. Acardo's definition of microcephaly, as he said, was two and a half standard deviations below the mean. The chart, however, although he said he would use it, the chart talks about two standard deviations from the average rather than the mean. So they say it's apples and oranges. However, that chart, as you will see, has on it that these are Z values, Z values. When the defense made that argument at the trial level, I went and got Dr. Acardo's dictionary that he himself wrote and pulled out the definition of Z values, and it is part of the record. The definition of Z values is deviations from the mean, which is precisely what he was talking about. And that is part of the record. And so they no longer make that argument in this court, not in their initial brief and not in their reply brief. In fact, there's not a word in their brief about the chart. That chart means exactly what it says. When we left Dr. Acardo's deposition, if they wanted to disclose an opinion that Donald Howell wasn't microcephalic, all they had to do was put it down on paper and send it to me. That's all they had to do. I leave there with a chart that shows that Donald Howell is microcephalic. I have a right to rely on that. I find out in the middle of trial that somehow there's going to be an explanation for this. I don't know what. And neither does this court, because there was no offer of proof, how this doctor was going to testify that a head size of 30.5 centimeters is not microcephalic when his own chart shows that anything under 30.7 is microcephalic. I have no idea how he was going to do that, but I do know this. I do know it was going to be one great big surprise for me. As far as the cross-examination of Dr. Gabriel, the court quite properly did not allow the defense to ask this lady, Mrs. Howell, if she remained in that allowed, let me start over. The court quite properly did not allow the defense to question Dr. Gabriel about Donald's lead levels not going up after he had been chelated in that year and a half from the time he was diagnosed to the time Mrs. Howell finally was evicted from the CHA because she kept asking to be moved. First of all, it proved nothing, because the testimony in the case from Mrs. Turks was that there was less and less lead paint falling off the walls. There's only so much paint that can fall off. And so there was absolutely no evidence that the condition of the apartment was anything like it had been earlier. Not a suggestion. Also, there was no evidence that Donald Howell himself remained in that apartment. They never asked her, Mrs. Turks, did Donald Howell stay in that apartment because he didn't stay in the apartment. That boy was out of the apartment. Mrs. Turks, and this is in the record, Mrs. Turks had her son living with relatives and with friends because she was scared for him. And so if the defense was allowed to ask Dr. Gabriel this meaningless question about the levels not going up at a time when the apartment is in an entirely different condition than it was back when the damage occurred, then what do I do? Do I put in evidence that she kept the boy out of the apartment? Now I've really created error. Here's an admitted liability case, and I'm showing that the defense, that the CHA didn't repair the apartment. It's not admitted liability. I'm sorry, you're absolutely right. Do I do nothing? Well, if I do nothing, then this jury looks at Mrs. Howell as a negligent mother, and the defense admitted when we were arguing this before the judge, admitted that they could see how a jury could believe the mother to be negligent. They could see that. The defendant complains about the jury instructions, and there is an error in our brief that I want to correct. In our brief, I incorrectly tell this court that the discussion about IPI 1004 occurred after it had been given as a preliminary instruction. That is incorrect. I went back, and I was reading the record last night. I don't know where my mind was. That is clearly not the case. The discussion occurred before it was given as a preliminary instruction. However, the rest of my argument is absolutely correct. IPI 1001 and 1002 were given as preliminary instructions with no objection. For IPI 1004, which the comment says should be given with 1002, for IPI 1004, defense said they didn't see why it was being given. They did not see where it gets us, and that's the quote. They didn't see where it gets us. They never objected to it being given, and they never ever told the judge that they thought that this would cause them prejudice. And the proof of that is at the end of the case, and I cite to this in my brief, IPI 1004, the instruction they complain about, was given without objection. On the issue of damages, I would say that one of the interesting things in this case is, while they criticized my closing argument, that my closing argument apparently did not lead to an unfair or unjust verdict. The defendant concedes that the verdict, except for lost income, which I'll talk about, except for that, was fair and reasonable. There is no challenge to the verdict amount. And with regard to the $2 million that the jury awarded for lost income, which obviously comes out to $50,000 a year, I put in the evidence that Illinois case law has required. I've put in that the child was disabled. I put in the child would never be able to work. I put in evidence that this child had and has a dedicated and devoted mother involved in his school, participating in school. That's all I can give a jury. So I have a child with endless opportunities and a devoted mother. And the jury took that and translated it into what I believe to be a very reasonable amount of money, $50,000 a year. If the court has any questions for me, I'd be happy to answer them. I hope I've addressed all the issues. Thank you. Thank you. Thank you, Your Honors. I'll be brief. There's a pervasive argument here that there was a need to dispel an issue of blame. And I think that that's not an accurate rendition of the record. You know, that's raised again and again in the plaintiff's brief. It was raised today. The CHA never blamed the plaintiff. There was no issue that the plaintiff had to be protected from that inference, especially given the emphasis by the judge and the acknowledgments of defense counsel. And to the extent that plaintiff's counsel makes a statement that defense counsel admitted that they understood there was a danger, there's something that was left out of that because the record shows, but that's not an issue in this case. And it wasn't an issue in this case because there was no contributory. Once the admission of negligence went in, all of that went by the wayside. The plaintiff dropped a spoliation count in the defense. It just never became an issue. And it was emphasized and reemphasized to the jury. So I don't think that had any place on this record. And there shouldn't have been a need to be protecting the plaintiff from some type of blame, because that just was never raised by the defense. The instruction issue, yes, that was discussed prior to the preliminary instructions that were read by the court. And defense counsel indicated its objection to the instruction by saying that the instruction was not relevant, given the admission. So to say that there was no objection, I think, is not an accurate account of the record, Your Honors. As far as the issue of the plaintiff's argument and closing argument, the statement, there was a statement that accused the CHA of dishonesty. It appears at volume 15, page 90 to 91, that where the plaintiff said, when you're addressing a child's life, you have to put on an honest defense. And the clear argument was that we were not putting on an honest defense. And I think that was very damaging in the eyes of this jury. As far as the Dr. Ricardo issue on the chart, that's not exactly an accurate rendition of the deposition testimony, because Dr. Ricardo referred to two charts, not the one that was shown to him, as charts that he would accept. And then the chart that was shown to him that counsel has attached to his brief, Dr. Ricardo said, well, if that's the one that contains the National Institute of Child Health and Development values, then that would be acceptable. And then there was no further questioning. So there wasn't this. Your position is that the disclosure was made by his response to the questions put to him at the deposition. Yes, Your Honor. Then why, when Judge Elrod offered to allow the explanation rendered by the doctor at the deposition, which presumably would give you the same right to argue to the jury, like you did to the judge, that he was taking the position that the child was microcephalic, why wasn't that accepted? Well, the order, if the court looks at the order, I'm sure the court has, the specific order was, Dr. Ricardo cannot testify that Donald was or was not microcephalic. So we're sort of in a catch-22 position. So now we're required only to read the exact language that's in the deposition. I mean, it's not, the order was not go ahead and read that. The order was, you can't testify that he was microcephalic or wasn't microcephalic. But it's your position that he had disclosed that opinion, in essence, at his deposition. So by allowing that answer to be supplied to the jury that you claim was an explanation of his position that the child wasn't microcephalic, would have given you the same freedom to make that argument to the jury as you did to the judge, leaving completely aside the fact that it would then be contradicting your other expert's testimony that the child was microcephalic. I think that the court's order may have hampered for them from being able to do that, Your Honor. And that's the truth. I mean, I think that the court's order saying you can't give this statement, if we're, you know, the flip side of that is if that's what that statement means, can we testify to that? I don't think the record is clear. I have to say that the crux of this case is that notwithstanding this admission, the plaintiff's burden remained unchanged. And the plaintiff had the burden to provide evidence, not speculation, that could establish to the jury that their case had been proved, approximate cause proved, to a reasonable certainty. And we submit our position is that it wasn't. We submit that in light of, at best case scenario, very weak causation evidence, that there were trial errors that damaged and hampered the ability of the CHA to be able to establish their case, and that invoked the sympathy and the passion of the jury so they overlooked an insufficient causation case. And on that basis, we would ask the court to enter a judgment notwithstanding the verdict or to remand for a new trial. Thank you. Thank you, Your Honors. Thank you, Mr. Graves. We take it under advisement.